Arthur MORELAND et ux., Appellants,

v.

The STATE of Texas, Appellee.

No. 16596.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Dec. 11, 1975.

Roy L. Fuller, Baytown, for appellants.

Carol S. Vance, Dist. Atty., Sara Bullock McIntosh, Gary DiBella, Asst. Dist. Attys., Houston, Walter E. Boyd, Houston, atty. ad litem, for appellee.

PEDEN, Justice.

This suit was brought by the State to terminate the parent-child relationship between the appellants and each of their four children, Madeline Kay, Richard L., Emilie Jean and Joseph, and to place the children with Harris County Child Welfare Unit as managing conservator. After a non-jury hearing the trial judge terminated the appellants' parental rights to the two younger children, Richard L. (born May 22, 1965) and Madeline Kay (born June 10, 1970); he appointed the Harris County Child Welfare Unit as managing conservator of the two older children, Emilie Jean (born on October 5, 1961) and Joseph (born on January

24, 1960) and released them to possession of the appellants.

The State based its suit on Section 15.-02(1)(C) and (D) of the Texas Family Code. They provide:

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

. . . . .

(C) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

(D) engaged in conduct . . . which endangers the physical or emotional well-being of the child;

and

(2) termination is in the best interest of the child.

■■■ Appellants complain that there was no evidence or factually insufficient evidence to sustain the trial court's finding that the parents violated either of these sections of the Family Code. Findings of fact and conclusions of law were made by the trial judge. In deciding no evidence points of error we view the record in the light most favorable in support of the trial judge's findings. *Fisher Construction Co. v. Riggs,* 160 Tex. 23, 325 S.W.2d 126 (1959). In reviewing factual sufficiency points of error we consider all the evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

We affirm the judgment of the trial court.

We recently stated in *D. F. v. State,* 525 S.W.2d 933 (Tex.Civ.App., 1975, no writ):

The court's "paramount concern is with the best interests of the children . . . There is a presumption that the interests of a young child are best served by award of its custody to its natural parents. The presumption is based upon a logical belief that the ties of the natural relationship of parent and child ordinarily furnish strong assurance of genuine efforts on the part of the custodians to provide the child with the best care and opportunities possible . . ."

. . . . .

The burden of proof on the issue of the best interest of the child is upon the one seeking to deprive the natural parent of custody. *Herrera v. Herrera,* 409 S.W.2d 395, 396 (Tex.1966). Before the drastic remedy of declaring a child dependent and neglected can be applied, the unfitness of the parent should clearly appear from the evidence. *Martin v. Cameron County Child Welfare Unit,* 326 S.W.2d 31, 36 (Tex.Civ.App.1959, writ ref'd n.r. e.). The evidence must be clear and convincing to give custody to another who is not the natural parent. *Calhoun v. Ruffer,* 425 S.W.2d 50 (Tex.Civ.App.1968, no writ). The evidence in the record authorizes the trial court to measure the appellant's future conduct by her recent deliberate past conduct as it may be related to the same or a similar situation. *De Llano v. Moran,* 160 Tex. 490, 333 S.W.2d 359, 361 (1960).

We summarize the evidence:

Officer Robert Douglas Knight of the Baytown Police Department was called by the State. On August 20, 1973, he answered a call to the Moreland residence complaining that one brother was hanging the other. The parents were not at home. He went to the house a second time after a call that the children were fighting and delivered the children into the custody of Child Welfare. The house was very disarrayed, with dirty clothes strewn around the living and bedroom areas, dirty dishes on the floor of the living room, and toys and other articles strewn around. Mrs. Moreland was arrested later that day for public drunkenness and again on September 2, 1973.

Appellant Mrs. Alice Moreland was called as an adverse witness. She is a housewife

and has been married four times. At one time she filed desertion charges against her husband. She admits to having had a drinking problem in 1973, but denies having it now. Her husband beat her on a few occasions in 1973, before they got their problems solved. Her explanation as to why no one was with the children when they were picked up was that someone was supposed to have been there but must have left. She had left them with a friend and gone downtown to the "No Tel" lounge, where she says she goes about once a month.

Appellant Arthur Moreland was called as an adverse witness. He is a machine operator for a plastics company and often has to work the night shift. He and his wife had separated at the time the children were picked up, and he had moved about three blocks away from his family. He says that in 1973 he beat his wife to "straighten her up" because she was drinking. Since he has had custody of Joseph, the boy has missed 79 out of 136 school days. He was sick quite a bit.

Jo Ann Tangedahl, a counselor at the Family Service Center and a social worker with three years' experience and a master's degree, testified that the appellants were motivated to get their children back but not to change their family relationships. She felt that counseling would not help them as they did not take it seriously. They cancelled many meetings and finally discontinued them. The family did a lot of laughing, and it was difficult to get them involved in counseling of any depth. The witness explained, on cross-examination, that the laughing was not just a demonstration of good humor. At one session Joseph said Jeannie had run off and gone swimming, so she should be punished. She should be tied up, put in a box and put into a freezer. He was laughing through all of this, and the witness found it inappropriate and frightening. She has never seen the children's environment. She expressed the opinion that the parents love their children and have close family ties but feels they are too

close. As children begin to mature they need to form their own identities. She believes the appellants do not have enough structure or discipline in their family, noting that they fail to set appropriate limits on the children's conduct. She recommends that the two older children continue to live at home; they have already been through their formative years so they could not benefit by moving to another home, but the two younger ones would have a better chance, in another environment, to assume responsibility for themselves and to become socially functioning human beings. Return of the younger ones to the parents would undermine the progress they have made in foster care. She admits the separation is going to be hard on the family, but believes the family is functioning better now than when the children were taken away. This improvement is the basis for her opinion that the two older children have put out more effort and should be allowed to stay in the home.

Karen Coit, a school teacher, stated that Richard has made tremendous strides in all academic areas while in foster care. One example is that his reading level has progressed from 1.5 to 4. in less than a year. Dennis Lee Odle, the principal at Royalwood Elementary School, said that when Richard came to his school he was approximately two years below grade-level. His progress is far above adequate. He has missed 9 days, mostly because of welfare appointments. Thomas Earl Langford, the attendance official for Goose Creek Schools in Baytown, said the attendance of all the Moreland children was poor since they had come to Baytown. During 1972–73 school year, Richard missed 35½ days. In the last year, when the oldest two children were in the custody of appellants, their attendance has been poor. Mrs. Moreland told him that they had been ill.

Elton Hill, the principal in a Goose Creek elementary school, stated that before Richard and Joseph were taken into custody their health was poor. Richard went to

school barefoot even in the winter, and he was proud of his shoes when he was given some. He appears to be hungry, and his clothes were dirty. He ate everything put on his plate at school.

Glenn Lloyd Harrington, counselor at Horace Mann Junior High School, reported that of the last 145 school days, while Joseph and Emilie have been in the care of their parents, Joseph has been absent 89 days and Emilie has been absent 67. When Joseph was in temporary custody at the Burnett-Bayland Home, he was absent only 9 days out of 170. The clothing they wear to school is sub-par, mismatched and unclean. On cross-examination he stated the clothes meet the dress code and the parents have not been uncooperative.

Suzanne Ruckman, a graduate student who worked on this case for the Harris County Welfare Unit, said the Moreland home was in a state of disarray when she saw it. When Kay came into foster care (August or September 1973), she had sores on her body, her teeth were rotten, and she couldn't sleep because her tonsils and adenoids were swollen. She couldn't sit at the table, couldn't feed herself and couldn't talk. She couldn't do most of the things three year old children normally do. She threw tantrums. Ms. Ruckman described the appellants' resistance to her help. The children ate until they got sick when they first came into foster care. Later, she noticed evidence that the appellants were cleaning up their home. Kay grew from size three to size six in four months of foster care. She felt appellants had parental love for their children but a great deal of dependence on them.

Joy Koons, who has been a social worker for the Welfare Unit for a year and a half, stated that Richard's self respect is now much higher than it was, that he now has pride and self control and he relates to his foster parents and communicates. He has friends in school. Kay also communicates now and is healthy. She couldn't put words together well before she came into foster care. Koons felt that it would not be bene-ficial to put Kay and Richard in the custody of their parents. When all the children are together, they go wild on family visits. She realizes they are excited, but they seem to feel they don't have to behave. She expressed the opinion, based upon her experience and knowledge, that the physical and emotional well-being of the children would be in danger in the Moreland home. The house is in a little better shape now, but if the children were returned she believes it would be too much for the parents to handle. The younger children have potential that will continue to develop, and they would be better off in foster care, but the older two children are past much of their lower development stages. She feels she has done everything she can but that the parents will not change. If the children aren't allowed to develop through normal stages to adulthood, it is very possible they will become delinquents.

Several witnesses were called by the appellants. Arthur Moreland testified that it has been over two years since he and his wife have had marital difficulties and since he has overcome his alcohol problem. He and his wife are getting along fine now, and he loves his children. He has repainted every room in his house and has done everything the Welfare Unit asked him to do. The children's poor school attendance was caused by illness, but he thinks that sometimes they were playing sick. He thinks Joseph missed the school bus 20 or 30 times. Richard had shoes, but he wanted to go to school barefooted. He took his shoes off when he got to school and left them outside. Mrs. Moreland stated her health has been poor recently, but she no longer has a problem with alcohol. Her weight has dropped from 165 pounds to 130 pounds since the children have been in Welfare custody. She has helped fix up her home and has cooperated with the Welfare people. She said she has no trouble controlling any of her children except Jeannie, who is at a bull-headed age. Since the children were picked up, the parents have made a third

bedroom out of the den so the boys could have one bedroom and the girls another. Then Kay wouldn't have to sleep with her parents. She thinks Emilie Jean plays sick to keep from going to school because she doesn't like the teachers, but she is working with Emilie Jean on that. Joseph has actually been sick a lot. She thinks she went to Pasadena Family Counseling nine times.

Josey Mae Smith, a next-door neighbor of the Morelands, has never been in the Moreland home but has visited with the family occasionally in her backyard. She said the children seemed happy, didn't look hungry, and their clothing was as good as that of the other children. When Richard came home, he was happy to be with his family. A couple of years ago the police were at the Moreland's house at least once or twice a week because of their marital problems, but she hasn't seen them there lately. The family has improved in every way. Tom Murphy, an acquaintance of the family, stated he used to have a woodworking shop across the street from where Mr. Moreland works. He saw him and some of his children almost every day. They dressed and looked like any other children.

Joy Koons was recalled and asked about specific failures of the Morelands to comply. She said the children are aggressive with their parents and with each other because no restraints are put on them. Joseph once attacked Richard and bit his ear. Emilie would sit on her father's lap and hit at him, bullying him. The parents' response to her pointing out specific behavior problems was, "That's funny." Mrs. Moreland once said her life with her brothers had been like hell and that she felt this was the way children were. The parents put the children down by continually calling them "bad" and "sick." She tried to work with them to be more kind to each other and to build each other's self-esteem. They didn't ignore her advice, they just seemed to do things their own way. They didn't seem to grasp what the witness was trying to do. Their behavior was often inappropriate. When told this, they would laugh. Joseph

put down Emilie a lot, Emilie was hostile towards Kay, and Richard became withdrawn. She pointed this out to the parents and later they accused her of telling Richard that he was afraid of his parents. They turned things around. She gave examples of Mrs. Moreland's fantasizing and exaggerating her own illnesses. She believes the children are pulled into this and that such behavior contributes to the children's being "sick so often."

Joy Koons related that Mrs. Moreland once told her that Emilie had been cut on the leg and had almost bled to death. The witness tried to find out how much blood there was and to deal with the facts that you don't die from a little loss of blood and that children do get hurt sometimes. She tried to separate the facts from fantasies, the children's illnesses from the parents'. Each time she would try to help them understand one problem they would bring up another. It was almost impossible to get them to change. She gave several other examples of inappropriate behavior which we think need not be detailed here. The Morelands kept repeating that they didn't have any problems and everything would be all right when the children were back with them. It was a kind of a wall they built up. She concluded that her counseling did not help the Morelands, in terms of education. She concluded that the Morelands love their children, but that the roles have become reversed: the children are the parents and the parents are the children.

Joseph Moreland, who was 15 years old at the time of the hearing, said he preferred to be with his parents, as did Emilie Moreland, 13.

■ We have concluded that the evidence in this case supports the trial court's termination of the parent-child relationship with Richard and Madeline Kay under paragraphs (C) and (D) of Section 15.02, Texas Family Code. In other words, the evidence supports the trial court's findings of fact that the parents have knowingly placed or knowingly allowed the children to remain in

conditions or surroundings which endanger their physical or emotional well-being, that the parents have engaged in conduct which endangered the children's physical or emotional well-being, and that termination of the parental rights of Alice and Arthur Moreland is in the best interest of Richard and Madeline Kay Moreland.

We think it clear that the evidence would support a conclusion that the well-being of Richard and Kay was in danger when the Welfare Unit received them in August 1973, and that the physical and emotional condition of both children had dramatically improved by the time of trial, some twenty months later.

The trial judge had an opportunity to view the parents' demeanor during the trial, to weigh their testimony, and to examine their past deliberate conduct as a means of predicting their future behavior. They seem to have made improvements in some aspects, and it is agreed that they love their children, but the trial court was entitled to consider the facts related and the opinion testimony given by the three social workers who observed and counseled with the Moreland family and who agreed that the parents' relationship with the two younger children, whose ages at the time of trial were 9 and 4, had been harmful to them and would likely be harmful in the future if resumed.

■ Although there is no complaint about the trial court's having declined to terminate the parent-child relationship as to the two older children, aged 15 and 13 on the trial date, we do not agree with the appellants' view that it is inconsistent to find that the surroundings endanger the well-being of two of the children and not of the others. The trial court could accept the opinion testimony that the older children had passed their major development stages and the testimony that having two less children in the family markedly improved the prospect that the parents could control those in their care.

An attorney appointed to represent the children argues on appeal that the parents have engaged in delinquent conduct in the past but are rehabilitating themselves and that the Welfare Unit should continue to have custody of the two minor children until the parents have achieved and proved their rehabilitation. His principal arguments are that the Morelands' parental rights not be terminated because (1) there was a violation of the children's constitutional rights of due process, (2) the judgment was not justified because the evidence presented concerned a period too remote in time, and (3) the State has not yet sufficiently rehabilitated the parents.

■ We overrule these arguments. As to the first, we find no failure to afford due process. The second argument is without merit because the Welfare Unit's witnesses testified to events indicating a continuation of the parents' problems to within six months of the trial date. As to the third, the proper issues before the court were the conduct of the parents and the best interests of the children, not whether the State has made enough effort to rehabilitate. Further, the only testimony on this matter is opinion evidence that further rehabilitation efforts would not be productive.

■ The appellants argue, by supplemental brief, that the trial court erred in rendering judgment for the Harris County Child Welfare Unit because no guardian ad litem was appointed to represent the children. Appellants rely on this provision of the Texas Family Code, § 11.10 (which was in effect from January 1, 1974, until amended, effective September 1, 1975):

(a) In any suit in which termination of the parent-child relationship is sought, the court shall appoint a guardian ad litem to represent the interests of the child, unless the child is a petitioner. In any other suit under this subtitle, the court may appoint a guardian ad litem

. . .

The court records reflect that on August 27, 1973, the trial judge entered an order

placing immediate custody of all four of the Moreland children in the Harris County Child Welfare Unit, fixing the time and place for a hearing so the parents could show cause why the children should not remain in the temporary custody of the Welfare Unit, and stating that "An attorney, Walter Boyd Jr. is appointed by the Court to represent said minor child at all hearings in accordance with statutory authority of Articles 695c–2 and 2330, V.A.T. S."

We find no reference in Art. 695c–2 or in Art. 2330, both of which were repealed effective January 1, 1974, by Title 2 of the Texas Family Code, to any authority to appoint someone to represent minor children at hearings to determine whether they were dependent and neglected. Art. 2332, however, provided that when such cases were filed, "In case neither of the parents or guardian is found, then the court shall appoint some suitable person to represent said child in said cause." The trial court's order did not state whether Mr. Boyd was being appointed as a guardian ad litem or as an attorney ad litem. The fact that he is an attorney would not be determinative of his capacity.

In *Sheehan v. Southern Pacific Co.*, 422 S.W.2d 948 (1967, writ ref. n.r.e.), Chief Justice Bell, writing for this court, stated that when a trial court, acting under Rule 173, Texas Rules of Civil Procedure, appointed a disinterested person to represent a mentally incompetent person in the suit, it was not fatal for the trial court to designate the appointee as an "attorney ad litem" although Rule 173 provided that under certain circumstances the court "shall appoint a guardian ad litem." See also *Peterson v. Peterson*, 502 S.W.2d 178 (Tex. Civ.App.1973, no writ).

It is interesting to note that paragraph (a) of § 11.10 of the Family Code was amended, effective September 1, 1975, to add a provision that in suits of this nature the court need not appoint a guardian ad litem to represent the child if an attorney ad litem has been appointed for the child

and need not do so if "the court finds that the interests of the child will be represented adequately by a party to the suit and are not adverse to that party.

Affirmed.