# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00008-CV

**Anthony Rigal, Jr., Appellant**

**v.**

**S. M., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. D-1-AG-09-000377, HONORABLE RHONDA HURLEY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Anthony Rigal, Jr., appeals from a final order terminating parental rights. In two issues on appeal, Rigal asserts that the evidence is legally and factually insufficient to support termination and that the district court failed to appoint an amicus attorney or attorney ad litem or to timely appoint a guardian ad litem. We will affirm the termination order.

## BACKGROUND

The child who is the subject of this suit is L.M., a girl born on February 10, 2008. On August 4, 2009, L.M.'s 17-year-old mother, S.M., filed a petition seeking to terminate the parental rights of Rigal, L.M.'s alleged father. The termination suit was based on an allegation that Rigal had been convicted of an offense under section 22.011 of the penal code (sexual assault).

Specifically, Rigal, who was 25 or 26 years old at the time, was alleged to have had sexual relations with S.M. in 2007 when S.M. was 14 or 15 years old. It is undisputed that L.M. was the child of that relationship.

In October 2009, a termination hearing was held before the district court. Several witnesses testified at the hearing, including S.M. and her mother and Rigal and his parents. We will discuss the evidence presented during the hearing in more detail when discussing the sufficiency of the evidence. However, we find S.M.'s testimony helpful in understanding the context in which this case arose, so we summarize it here.

S.M. testified that, after L.M. was born, she had continued her "dating relationship" with Rigal until late October 2008. At around that time, S.M. explained, Rigal had hit her twice in the face, using his fist. According to S.M., this was not the first time Rigal had been violent toward her. Once, S.M. testified, when she believed she was pregnant, they were "arguing over him talking to other females," and "he proceeded to kick me in the stomach." As a result of Rigal's violence toward her, S.M. explained, she decided to end their relationship. Shortly thereafter, S.M. obtained a protective order against Rigal, a copy of which was admitted into evidence. The protective order prohibited Rigal from communicating with or contacting S.M. or L.M. When asked why she felt she needed to obtain a protective order, S.M. testified that it was because Rigal was "calling and threatening me." S.M. recalled, "He would tell me like, 'You're a dumb bitch,' He said he was going to kill us all, he was going to get us and things like that . . . ." S.M. was also concerned about Rigal's alleged use of marihuana, which she claimed Rigal had used in the presence of

their child.[1]  After obtaining the protective order, S.M. also decided to file criminal charges against Rigal for sexual assault.  Rigal was ultimately convicted of that offense, which formed the basis for the current termination suit.

At the conclusion of the first day of the termination hearing, the district court decided to appoint a guardian ad litem for the child.[2]  The district court then recessed the proceedings so that the guardian ad litem could investigate the case and file a report with the district court.  The proceedings continued on December 16, 2009.  At that time, the guardian ad litem testified and his report was admitted into evidence.

At the conclusion of the hearing, the district court terminated Rigal's parental rights "on the grounds of the criminal conviction as alleged in the petition."  The district court also found that termination was in the best interest of the child.  This appeal followed.

---

[1] On cross-examination, S.M. admitted that she, too, had used marihuana.  She denied using cocaine, although Rigal later claimed in his testimony that cocaine was S.M.'s "drug of choice."

[2] It is unclear from the record why a guardian ad litem was not appointed before the hearing began.  During the presentation of evidence on the first day of the hearing, the district court noted that "there's supposed to be a guardian ad litem appointed in contested cases" and asked counsel, "What happened?"  Trial counsel for S.M. responded that the Travis County Domestic Relations Office "never got a copy of the [termination] petition."  *See* Travis (Tex.) Civ. Dist. Ct. Fam. Law Loc. R. 5.3 ("In every suit in which the petitioner seeks to terminate a parent-child relationship or seeks to adopt a child, the Clerk shall forward a copy of the petition as soon as practicable to the Manager of the Family Court Services Unit of the Travis County Domestic Relations Office. . . .").  The district court reminded counsel, "Our normal procedure in contested termination cases is that a guardian would be appointed for the child to make a study of this and a recommendation to the Court."  The district court added, "I don't know that I'm willing to find that [the mother's and child's] interests are so aligned that a guardian is not necessary in this case."  The district court concluded, "I'll take it under advisement and consider whether or not to appoint a guardian ad litem after the fact.  Unfortunately, that's not how this case should have gone, but we're in it, so we're going to finish it. . . .  We'll finish the evidence today and then we will recess."  Neither party objected to the district court's decision.

3

**ANALYSIS**

**Procedural issues**

We first address Rigal's second issue, in which he complains of the district court not appointing an amicus attorney or attorney ad litem during the proceedings and not appointing a guardian ad litem until after the termination hearing had already begun. *See* Tex. Fam. Code Ann. § 107.002(c)(4) (providing that guardian ad litem appointed for child is entitled to "attend all legal proceedings in the case"); .021(a-1) (West 2008) (providing that in termination suit not filed by governmental entity, "the court shall, unless the court finds that the interests of the child will be represented adequately by a party to the suit whose interests are not in conflict with the child's interests, appoint one of the following: (1) an amicus attorney; or (2) an attorney ad litem"). According to Rigal, "this error violated his fundamental right to be a parent," and he "requests that this Court, if nothing else, remand to allow [the] proper procedure to be followed."

Rigal raises these complaints for the first time on appeal. There is no indication in the record that Rigal ever objected to the district court not appointing an amicus attorney or an attorney ad litem, or to the district court's delay in appointing a guardian ad litem. Thus, any error has been waived. *See* Tex. R. App. P. 33.1; *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) (observing that "the rules governing error preservation must be followed in cases involving termination of parental rights"); *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) (explaining that, "[i]n termination cases, judicial economy is not just a policy—it is a statutory mandate" and that "[a]ppellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their

4

resolution"); *In re Baby Boy R.*, 191 S.W.3d 916, 921 (Tex. App.—Dallas 2006, pet. denied) ("In a termination case, 'adhering to our preservation rules isn't a mere technical nicety; the interests at stake are too important to relax rules that serve a critical purpose.'") (quoting *In re L.M.I.*, 119 S.W.3d 707, 708 (Tex. 2003)).

We overrule Rigal's second issue.

**Evidentiary sufficiency**

In his first issue, Rigal contends that the evidence is legally and factually insufficient to support termination. We disagree.

A court may terminate parental rights based on findings by clear and convincing evidence that (1) a parent has committed any of several statutory bases for termination and (2) that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see* Tex. Fam. Code Ann. §§ 161.001-.007 (West 2008 & Supp. 2009); *Holley v. Adams*, 544 S.W.2d 367, 370-72 (Tex. 1976). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *see In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

In a legal sufficiency review of a finding terminating parental rights, an appellate court reviews all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the fact-finder's conclusions and the role of a court conducting a legal sufficiency review, a reviewing

5

court must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *Id.* An appellate court disregards all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.*

In a factual sufficiency review of a finding terminating parental rights, the inquiry is whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *Id.* A court of appeals must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *Id.* A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

In this case, the relevant statutory basis for termination is section 161.007, which provides that the court may terminate the parent-child relationship if "the parent has been convicted of an offense committed under Section 21.02, 22.011, 22.021, or 25.02, Penal Code," and, "as a direct result of the commission of the offense by the parent, the victim of the offense became pregnant with the parent's child." Tex. Fam. Code Ann. § 161.007(1), (2) (West 2008). Here, there was undisputed evidence that Rigal had been convicted of an offense committed under section 22.011 of the penal code, specifically sexual assault of a child. The judgment of conviction was admitted into evidence without objection, and it reflects that Rigal pleaded guilty to committing that offense. Additionally, S.M. testified that her sexual relationship with Rigal had resulted in

6

her pregnancy, and Rigal testified that L.M. was his daughter, that S.M. was his daughter's mother, and that he had filed an Acknowledgment of Paternity while he was in prison. In his brief, Rigal concedes that S.M. became pregnant during their relationship and that he pleaded guilty "to the technical penal code definition of sexual assault,"[3] but he "submits that he did not force [S.M.] to have an intimate relationship and argues the Court should at least consider this fact." However, lack of consent is not an element of the offense of sexual assault of a child, and it is undisputed that S.M. was younger than 17 years of age when she became pregnant with L.M. We conclude that the above evidence is legally and factually sufficient to support the district court's finding that Rigal committed the offense of sexual assault of a child and that, as a direct result of the commission of that offense, S.M. became pregnant with Rigal's child. Accordingly, the first element supporting termination has been satisfied.

Regarding the district court's best-interest finding, there are several factors courts are to consider when determining the best interest of the child. The factors include but are not limited to (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse

---

[3] *See* Tex. Penal Code Ann. § 22.011(a)(2), (c)(1) (West Supp. 2009) (defining sexual assault to include sexual conduct with child younger than 17 years of age).

for the acts or omissions of the parent. *See Holley*, 544 S.W.2d at 371-72. No one factor is controlling, and the facts of a case may mean that evidence of one factor is sufficient to support a finding that termination is in the children's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). Permanence is of paramount importance in considering a child's present and future emotional and physical needs. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). A parent's statutorily offensive conduct is often intertwined with the best-interest determination. *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.).

We will now summarize the evidence relevant to the district court's best-interest finding. On the one hand, there is evidence tending to show that it would be in the child's best interest not to terminate Rigal's parental rights. Chief among this evidence is the report and testimony of the guardian ad litem, Christopher Fresquez, who testified that he had met with Rigal twice since being appointed but had not had an opportunity to observe any interaction between Rigal and L.M. Fresquez concluded that he did not believe that it was in L.M.'s best interest that Rigal's parental rights be terminated. In his report, Fresquez explained,

> Mr. Rigal, Jr. has a history of concerning behavior which led to a court order prohibiting his possession of [L.M.] However, I do not believe there is clear and convincing evidence that Mr. Rigal is fundamentally incapable of addressing his shortcomings and re-establishing a relationship with [L.M.] Unless and until he is able to do so, I believe the current court order provides [L.M.] with appropriate protections.

During the hearing, when asked what was the primary reason for his recommendation that Rigal's parental rights not be terminated, Fresquez testified,

8

The primary reason for that is the age of my client, the fact that I do believe current orders afford her appropriate protections. That should Mr. Rigal make changes that address the concerns that led to his incarceration and led to the denial of access, that it would require him to open a new lawsuit, require the supervision of the court, require him to provide documentation and prove that he has made necessary changes.

Fresquez maintained that he did not believe Rigal was "incapable of addressing the concerns" that led to Rigal not having access to L.M. However, he added, "But that being said, I'm also not in a position where I say that I believe that he will address those concerns." Fresquez concluded, "I certainly can't guarantee that [Rigal] will not continue to use substances and engage in inappropriate behavior. That said, . . . . If he's able to make appropriate changes, I believe my client deserves to have a relationship with her father."

In addition to Fresquez's report and testimony, Rigal and his parents testified that Rigal had a "close bond" with and loved his daughter and that, before he had gone to prison, Rigal had spent a considerable amount of time caring for L.M. on a daily basis, buying her diapers, bottles, and books, and watching her grow. According to Rigal, L.M. recognized his voice, followed him around the house, and loved him. Rigal further testified that he was taking Bible correspondence courses, anger management and parenting classes, and job training programs while incarcerated. Rigal also claimed that he would be eligible for parole in September 2010[4] and that, upon his release, he wanted to open his own "burger shack" so that he could eventually afford to send his daughter to private school.

_____

[4] This claim contradicts Fresquez's report, in which Fresquez states that Rigal is eligible for parole on March 11, 2011. According to the judgment of conviction, Rigal was sentenced to three years' imprisonment on April 27, 2009. Thus, as Fresquez observed in his report, Rigal might not be released until 2012.

On the other hand, there is considerable evidence tending to show that it would be in the child's best interest to terminate Rigal's parental rights. First, there is the testimony of S.M., summarized above, tending to show that Rigal has a history of drug use and violence toward his daughter's mother. Moreover, there is Rigal's criminal history. Although his conviction for sexual assault of a child is the most notable offense, there is more. Also admitted into evidence was a judgment revoking Rigal's community supervision for the second-degree felony offense of robbery. This offense was committed in 2005 and resulted in Rigal being placed on community supervision for four years. Rigal's community supervision was revoked at the same time he was convicted for sexual assault. And, according to Fresquez, Rigal is also serving a concurrent sentence for committing a "terroristic threat" against S.M.[5] Despite his recommendation that Rigal's parental rights not be terminated, Fresquez testified that he was concerned about Rigal's history of violence and its effect on Rigal's ability to parent L.M.

S.M.'s mother, Maria Nardedalya Ledesma, lived with her daughter and testified that she believed that it was in L.M.'s best interest that Rigal's parental rights be terminated. Ledesma based this belief on her knowledge of Rigal's threatening behavior toward S.M. Ledesma also testified that she had not been aware of the relationship between Rigal and her daughter until after S.M. had become pregnant.

---

[5] Although the judgment of conviction for this offense does not appear in the record, the judgment revoking Rigal's community supervision states that Rigal committed a "subsequent criminal offense" on March 4, 2009, by threatening to assault S.M. with the intent to place her in fear of imminent serious bodily injury. This offense may be related to the threatening phone calls that S.M. claimed Rigal had made after their separation.

Additionally, there was evidence tending to show that if Rigal's parental rights were not terminated, L.M. could be placed in a potentially unsafe environment with Rigal's family. Rigal had lived with his parents prior to his incarceration, and Fresquez testified that he was "not aware of any plan other than him returning to his parents' house" upon his release from prison. In his report, Fresquez stated that "members of [the Rigal] household have concerning and recent contacts with police. Not including Mr. Rigal, Jr., arrests and charges since 2005 include: Unlawful Carrying of a Weapon, Assault with Bodily Injury Dating Violence, Possession of a Controlled Substance (Cocaine), Driving While Intoxicated and Burglary of a Habitation." Additionally, Fresquez reported that Rigal's father "was placed on deferred adjudication for Hindering a Secured Creditor in 2004," but that his probation was revoked in February 2007 for cocaine use. Thus, the district court could have reasonably inferred that if Rigal's parental rights were not terminated, L.M. could grow up in an environment among people with a history of engaging in violence and criminal activity. In contrast, Fresquez provided a positive report of S.M.'s home environment, stating that "no risk factors were noted." And, although S.M. admitted that she herself had used drugs, there is no indication in the record that she or other members of her household had any other criminal history.

In summary, the evidence supporting Rigal's position that termination was not in the child's best interest consisted primarily of the testimony of Rigal and his parents and the report and testimony of Fresquez, whose recommendation was based on his belief that Rigal was not "incapable" of changing his behavior and his opinion that the current orders provided "appropriate" protection for L.M. The evidence supporting S.M.'s position that termination was in the child's best

11

interest consisted primarily of the testimony of S.M. and her mother and court records tending to show that Rigal had a documented history of violence and criminal activity. The district court was in the best position to assess the credibility of the witnesses' testimony on both sides and to weigh that testimony against the documentary evidence also presented. On this record, we conclude that the evidence is legally and factually sufficient to support the district court's finding that termination of Rigal's parental rights was in the best interest of the child.

We overrule Rigal's first issue.

## CONCLUSION

We affirm the order of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed: July 29, 2010

12